The next matter on our calendar is the United States v. Rod Shawn Black, Daniel Rodriguez, and Ernest Green. Thank you. Good morning, Your Honors. My name is Michael Filosetta, and I represent the United States in the appellant in this action. Your Honors, four days before jury selection in this matter, one of the five defendants filed a speedy trial motion. The others then joined in with that motion, but did not file their own. During the course of this three-month trial that — Have the defendants been complaining all along? No, Your Honor. About the delay? No, Your Honor. I don't believe that there has been a sufficient record shown that the assertion of the right in this case, unlike Togano, unlike in Peniket, and in other cases, that the defendants have asserted their right sincerely since the beginning. In fact — So let me ask you, Counsel, what is your connection with this case? Were you trial counsel? Yes, I was, Your Honor. Okay. So you're familiar — were you trial counsel throughout the case? No, Your Honor. I came on as trial counsel in the year 2016, and I was second chair to another trial counsel, but I did try the case with him. Okay. So, did you work on the appeal brief here? Yes, Your Honor. Okay. So, as I understand it, the superseder brought some new charges and some new defendants, right? That's correct. With respect to the Sixth Amendment issue, when does a Sixth Amendment right to a speedy trial attach? Do you know the legal standard for that? My understanding is that it attaches when the individual has been accused of the crime. Okay. So, the superseder, with respect to the Harper counts — and let's just focus on the Harper counts — brought a kidnapping charge and two firearms offenses that had not been previously charged, right? That's correct. So when does the Sixth Amendment right with respect to those counts in the superseding indictment attach? The Sixth Amendment right as to those counts attaches at the accusation, which was in December of 2014, when the superseding indictment was filed. Okay. And why doesn't your brief on appeal make that point? I don't believe that that was raised in the response by the defendants. It wasn't raised in our brief and it wasn't raised in the reply, but I also don't think it was raised in the response, Your Honor. Well, did you raise it below? Yes, it was raised in the government's motion for reconsideration. Before Judge Scrutiny. Yes, Your Honor. Which was denied by the court only a couple days after it was filed. It was at docket 784. So in your motion for reconsideration before Judge Scrutiny, you raised the issue of when the Sixth Amendment right attaches to those new counts. I don't think it was specifically crystallized in the way that Your Honor just asked the question, but it was referenced in there that that's when — in laying out the timeframe of when the charges were laid — that that's when those charges were laid in the December 2014 superseding indictment, and that the Sixth Amendment claim as to those rights then should have started from the filing of that indictment. From the superseder? Correct. Okay. Now, you make this — you have in the Western District of New York, sadly, other cases raising these same kinds of issues, including the Penick decision. Yes, Your Honor. Did you work on that at all? No, Your Honor. Okay. And in that recent litigation in the Western District of New York, the Sixth Amendment attachment issue was specifically raised by the government? Yes. Okay. And specifically addressed by the district court in that decision. Judge Arcara, correct? Yes, Your Honor. Okay. So, with respect to the time after the superseder was filed, let's just put the framework here. The superseder brings charges with respect to a new crime altogether, and it adds two new defendants. And new charges as well, Judge, yes. And the new charges I've already discussed with respect to the Harper counts. Yes, Your Honor. Okay. Now, given the jury trial, the only thing that survived is the Harper counts for which there was a hung jury. Yes, Judge. Okay. But if there had been a conviction with respect to the new defendants, or with respect to the other crime, the Singer crime, when would the speedy trial claim begin, attach with respect to those? And, of course, I'm asking you the obvious. It attaches at the time the superseder's filed. Yes, Judge. I think that's an even easier answer as to the new defendants or the new charges. The new offense, the Morris-Singer robbery and kidnapping. But we have here today the original defendants, not the new defendants. Is that correct? Yes, Your Honor. That's correct. We do. And to get back to what the Court asked about the assertion of the right, this is so different from the prior case that this Court decided in Togano or in Penick. The tactical decision here as to when to file the claim, I think, is instructive. As the defense said, that they were waiting for the alleged violation to have ripened. This was opportunistic. This was not sincere. The Court has expressed caution in weighing . . . It wasn't the defendant's fault that the government took two years to try and get a decision from Maine Justice on whether to seek the death penalty, was it? Well, Judge, the death penalty decision had nothing to do with the delay in this case whatsoever. But in . . . Didn't it delay the first two years of this case? Not at all, Judge. And that actually is . . . Tell me why not. Your Honor, the District Court in this case decided this decision sixteen days after Togano was published. And the Court, in my . . . in our opinion, overestimated or misapprehended what the law was in Togano. Let's stay with what you've been asked. You were asked about the government's two years to decide about whether this is a capital case and you said, I believe, that has nothing to do with the appeal, right? Judge, there's two reasons why it does . . . Didn't the defendant say, then we need an extension of time to respond to motions because we don't yet know if this is a death penalty case? Judge, there's two reasons why it doesn't matter. Did they say that? Yes. At the very beginning, there was . . . And was there an extension granted because the government told the judge, we need time to decide about death penalty? Well, I think that's what the request was from the defense, that they wanted some additional time. But that was . . . And was that request made because the government said, we, the government, need more time to decide about death penalty? No, Judge. It wasn't? I'm sorry. Well, the . . . Did the defendants ask for an extension of time to answer motions because of the government's statement that it needed more time to decide about the death penalty? That was the stated reasons why the defendants requested the brief adjournment for the scheduling order, yes. And had the government, indeed, so informed the court that it needed more time? No, Judge. It had not? No. In fact . . . Never told the court, we need more time to do it? Never. That's not what took place here. Did they ever say to the court, the matter of death penalty is under advisement in the Department of Justice? What happened here, Judge . . . Did they do that? What happened here, Your Honor, is that the government . . . I think that's a yes. I'm sorry. Can you answer Judge Newman's question? Did the government tell the district court that the issue of whether this is a death penalty case is either under advisement or being considered or similar verbs in the Department of Justice? Yes. That was stated by the prosecutor. It was stated? Yes. It was, Judge. And is it so that the district judge . . . part of the district judge's reasoning in this an uncertainty of whether there would be death penalty? That's what was stated in the decision, yes. And does your brief say, there's no anxiety because we had not yet filed charges? That's correct. And is it the government's position that when the Department of Justice says, we are considering subjecting you to death, that does not create any anxiety on the part of the defendant? No, but that's not what was stated in court, Judge. This is . . . This is your brief. In our brief, what we stated was, and what I submit to this court now, is the government never at any point told the defendants that they were facing the death penalty or being considered for the death penalty. What the government said . . . Or even being . . . I thought you just said, we did tell the court the department was considering the death penalty. That's not what we said, Your Honor. What did you say? What the government said is that there is, quote, a likelihood of additional charges down the road. What the government attorney is guilty of here is being too frank and too forthright. He said at the magistrate-judge level, immediately upon arraignment, Your Honor, I want to advise the court. This is . . . When you said additional charges, did you identify what they might be? No, but this was well known. This was discussed . . . Are they charges that carry the death penalty? Yes, that's what was discussed. So, when you said . . . Well, that way. When you said to the court, there may be additional charges, and it was, as you just said, well known, that those charges carried the death penalty, are you still saying, we did not tell the court we're considering the death penalty? That's correct, Judge. Really? Yes, Judge. If I . . . Do you follow that sequence of . . . I mean, I don't want to confuse you. I'm not confused. I followed it very carefully, Your Honor. You told the court we're considering additional charges. The court understood those charges carried the death penalty, right, so far? Yes, Your Honor. And your third step is, but we didn't tell the court we're considering the death penalty. Is that right? Judge, if I can . . . Go ahead. What the government attorney said is, look, this is a Hobbs Act robbery that these gentlemen are charged in, and this robbery ended with the victim being executed with two gunshot wounds to the head. So, he was putting the court on notice. There is a possibility, if not a likelihood, of additional charges down the road. Carrying the death penalty. If those charges are filed for a 924J for a discharge . . . So, the government did advise the court you were considering the death penalty? No. All the prosecutor was saying, Your Honor, was saying if these charges are brought . . . Counsel, may I see if I can help you here? Under DOJ process, if you file a charge that is called death eligible . . . Yes, Your Honor. There is a mandatory DOJ review process with respect to the decision of whether or not the government will choose actually to seek the death penalty. That's correct. And pursuant to that process, there's either a no-seek decision or a seek decision. That's correct. And many local districts do not actually, except in the rarest of circumstances, ever advise the Department of Justice that they, as the local prosecutor's office, seek the death penalty with respect to a death eligible offense. That's absolutely correct. And that's what's going on here. All the prosecutor is doing is saying, I would recommend that the court appoint experienced counsel because this is a serious matter. This isn't a simple Hobbs Act robbery. This is a Hobbs Act robbery that ends with an execution. And I just want to foreshadow to the court, there's a possibility that this indictment could change down the road. And if it does, experienced counsel would be advisable. And so the court, this district court, then uses that as an opportunity to look back and say, there was two years and 10 months when all of these defendants were under the scepter of death. And that's just not what took place. No, he didn't say the scepter. He said anxiety because of the possibility of facing the death penalty. But Your Honor, any American is under the possibility of facing the death penalty if charges are brought. But there were no charges brought in that regard. There were no charges brought until December of 2014. And this was a. You're the defendant and the government says we're considering a death eligible crime. We're considering it. Haven't brought it. We're just considering it. You don't think that raises any anxiety about the death penalty? I think the defendants knew immediately upon being charged, Judge, that they were charged in a Hobbs Act robbery where the victim was executed. They always were aware of the fact that a grand jury could return a superseding indictment charging them. The government did not say we're considering the death penalty. The government stated very clearly there is a possibility of potential charges down the road related to the death. But the government also stated, but we should not hold matters up. We should not stall this case. We are ready and able to proceed. And the defense attorneys themselves stated early on. When did you first approach the department about a death penalty eligible offense? That's not before us on the record, Your Honor, and I can't state to the court with clarity as to what the specific date was that it was submitted. Can you give me an approximation? I believe it was, and I know this is not in the record, but I believe it was the government brought, got final approval from the department at around the time of the indictment because it was 32 days later when the government told defense counsel that . . . Well, all right. You were in touch with the department about whether there should be a death eligible case. There was some communication prior to that, obviously. When you were in touch with them, had the decisions of this court concerning delays in the northern district come down? Western. Western, excuse me. No, Your Honor. None of them had come down? The Penick decision and the Togano decisions came after the superseding indictments matter. But the U.S. attorney was aware of the speedy trial requirements. Wasn't he or she? Of course, Your Honor, but as Judge Cote has noted is that the department can't really make a determination as to death penalty eligibility until the charges have been brought, and these charges weren't brought for reasons stated in the record, that we didn't have the necessary witness, our cooperating witness, until well into 2014. That's when the superseding indictment was sought. That's when the department made the decision for a no-seek, and we immediately notified counsel within 32 days of the accusation. How long did the department take to decide whether this is a death eligible case? I don't know from what point after the plea of the cooperating witness that the government had its evidence and was proceeding to grand jury for superseding. At what point during that stage, the department had what they needed. But it would have been sometime between the plea in February of 2014 and the actual superseding indictment in December of 2014. When during this period did the photo array get lost and be found in the officer's home? Yes, Judge, the photo array issue I'd like to address. There were nine photo arrays in this case, and there were only three that were of issue. It was with one witness, Ms. Sabrina Mack, and it was all three of these defendants. She had identified individuals in the photo arrays, and in the government at the time that the photo arrays were shown to her, memos were drawn up by the police detective, particularizing the manner in which the arrays were shown, what the witness said, et cetera. Those were all turned over early on in discovery. A year before the hearing was held as to the identification issues, the government was informed that the Buffalo Police Detective could not find or had misplaced those three photo arrays. So the detective then went and was able to recreate the original arrays from the computer system. They just didn't have the markings of the witness, Ms. Mack. But in all other respects, they were identical. Those were what were used at the hearing a year later. And so the defense had the opportunity of notice of the ID, to move against the ID, to litigate the ID, and approximately two months after the hearing on the photo arrays were completed, the government discovered, or the detective discovered, the photo arrays now with the markings, and those were disclosed. And this was an ID case, wasn't it? Wasn't that the defense? There was, yes. Identification was the defense. But there were, as I stated, nine identifications, and two of the witnesses the government called were cooperating defendants who were charged with these defendants. All right. You have two minutes for rebuttal. We'll hear from the three defendants who are here today, and they're going to specifically respond to the argument that this claim for a speedy trial was never made timely. Thank you. May it please the Court, Donald Thompson for Rajshawn Black. I was involved in the case throughout below. Mr. Green, for one, first demanded a speedy trial on the date he was arraigned. After that, other defendants at various times made independent requests, and either orally or in writing throughout the course of this case, made those requests. This Court noted in Togano that not everyone is Mr. Togano, and that's not expected of anyone as far as the assertion of the right. You don't have to be Togano to adequately assert the right. They knew they were in pretrial detention for more than five years. They were. And they, as noted, I think in Pennick and in Togano as well, we don't have a federal detention facility in the Western District of New York, so it makes it difficult. They remain in local jails, or they're housed in Ohio, or they're housed in Virginia, which creates problems for access by counsel. For one thing, it created problems in this case for the government in producing the defendants. Where were they housed? Mr. Black, for one, was housed in Chautauqua County. He was housed in Niagara County. He was housed in Northeast Ohio. He was housed in Northern Neck Jail, which is in Warsaw, Virginia. He was housed in Chautauqua, or excuse me, Cattaraugus County for a brief time, and he was housed in the Monroe County Jail as well. Did you ever ask the government to bring him to a, your seat of court, during the days you needed to consult with him? Yes, Judge, if you review the record in this case, I filed a rather vociferous series of motions with the court to have Mr. Black return to the district so that we could have access to him to prepare for trial. And what happened to that? I was unsuccessful with all of those motions. Many of them- Was that to bring him there from the time of your motion until trial, or was that to bring him there for a specific conference you wished to have? I would have settled for either one, but we needed to do trial preparation. At that time, he happened to be in Ohio. He happened to be in a special housing unit in Ohio, because Mr. Rodriguez was also there, and there was a no contact order between them. So- Did they oppose that motion? They opposed the first one or two. After that, they rested on the court's discretion. The court's position was, I can't direct the marshals what to do. May I ask, was there a security level restriction with respect to housing your client? Did your client require a more secure facility from the Bureau of Prisons' perspective? I'm a little surprised that there's no pretrial detention facility at all near the court in the Western District, or is it, there's no secure, there's no pretrial detention facility that is secure enough for that classification of defendant. You should not be surprised, Judge. There is no federal facility in the Western District of New York. Well, we use a lot of contract facilities down here, too, but I'm trying to understand. Okay. Well, the local jails that they use have these contracts, and they have X number of slots for federal inmates. So, Mr. Black, much to his detriment, is mouthy. They don't like him. So, if they get fed up with Mr. Black, they'll say, well, okay, we're not going to take him. Send him on to the next facility, wherever that may be. So then he would go to the next facility, and he would go on. So that's how that worked. If I could clarify just a couple of points that were raised during Mr. Felicetta's argument, Judge Newman, with respect to the question of whether the government advised that this would be a death penalty case, at arraignment of Mr. Rodriguez, the first defendant arraigned on the indictment, the US attorney said it could be a death penalty eligible case. I would just urge the court to appoint experienced counsel. That's at Government Appendix 102. So from the very date of arraignment- That's good practice, right? Defense counsel want the government to put them on notice that learned counsel may be required as early as possible. That's actually what we want the government to do, right? Actually, beyond that, the CJA plan in the Western District requires that the court inquire if this is a capital eligible case as to whether the government intends to proceed in that fashion. Unless the government says no, then the court is required to appoint capital counsel. Here the government affirmatively said yes. It wasn't just we're looking at potential other charges, it was we're looking at capital prosecution from the very date of arraignment. These defendants were on notice of the specter, if you will, of capital prosecution. With respect to the delay in the filing of the superseding indictment, if I could just clarify that briefly, Mr. Felicetta indicated that the superseding indictment was not able to be brought until the cooperating witness engaged in an agreement with the government until it came forward with further information. The first time that was ever mentioned was in the motion for re-argument after Judge Scretany had dismissed these charges on speedy trial grounds. That was never in the record prior to this. I don't know that it's adequately in the record now, it's just an unaffirmed assertion of counsel in the motion papers. In any event, Mr. Callahan had nothing to do with the Singer charges, which were also included in the second indictment, and which were filed just shy of the expiration of the statute of limitations, although the Singer incident took place some three weeks after the Harper incident. The government waited almost five years before filing those charges. Mr. Callahan had nothing to say about those charges, so that can't explain the delay in the superseding indictment either. I see that my time is up. May I ask, if I could extend to ask, to what extent do you feel that the government is responsible for any delay that's of concern here after the superseder was filed? Well, I mean, I think this case is a good contrast with the Pennock case. In Pennock, for example, there were a number of motions by the government to decide motions, because in the government's view, the judge was not moving quickly enough, and I think this court acknowledged that to be the case. The government also filed a number of motions to set a trial date. I'm sorry, just to make sure I understand that point you just made. Yes. So you think the government's failure to file motions before the district court, after the superseder was filed, urging the court to act faster, that's one thing you would say? Well, yes, because the government is charged with institutional delay, so to the extent that that institutional delay is accruing, whether it's accruing because of the court's actions or the government's actions, they're going to be charged with it. So yeah, I think they should follow up on that. As this court noted in Togano, they have an affirmative obligation to press the case to I think it's clear that didn't happen here. They never made a motion to set a trial date. So I think even after the superseding indictment, there is a decent amount of institutional delay that's chargeable to the government. Thank you. Very helpful. Thank you, counsel. Good morning, Your Honors. If I may please the court, my name is Barry Covert. I represent the appellee Daniel Rodriguez. Did Mr. Rodriguez ask for his speedy trial rights early on? He did, Your Honor, in December of 2012. And I think that what's important here is the government really seeks to have it both ways. They showed up at arraignment, and as Mr. Thompson said, at my client's arraignment on March 7th of 2012, they immediately said that this is a capital eligible case. Judge, you're correct. They said eligible, and that's correct. We were assigned, myself included. I've been involved. It wasn't a surprise to you, given the fact that there was a murder and everyone knew there was a murder. Well, personally, it was a complete surprise to me because I just got a phone call a couple hours earlier. So I apologize. Yes, it was a brand new case. My client was picked up the day before. I got a phone call. I was on the list. We have a short CJA list. We have a much shorter death eligible list. So then the government immediately said two things. One is this is a death eligible case. Number two is that this indictment is going to be superseded. They couched it with likely to be superseded, but we knew it was going to be superseded. And they said for the next few months, including when we sought for adjournments, the government themselves, it's right in their papers that they filed. It's right in the transcripts. They kept saying we're expecting a decision on the death eligibility within 60 days. They kept saying that repeatedly. Now, to Judge Newman's question, what's the significance of 60 days? Well, Judge, you're the first person that I believe got an answer out of the government as to when they actually made their application as to a decision on death eligibility. And I believe Mr. Fellow said, I think for the first time now has acknowledged that that decision was not even sought for about two more years. They didn't even ask DOJ. Did you put in a mitigation package? No, we were waiting to. We knew what the process was. We knew what the procedure was because we had prior counsel that had gone through the process, my partner Herb Greenman had gone through it. He'd gone to DOJ. We kept waiting for the government to tell us. I'm sorry, you're talking about your co-counsel on whom? I'm sorry, a partner in my firm, not co-counsel, I shouldn't have said that. Herbert Greenman had gone through this process. So I was familiar for another defendant, no, for an unrelated defendant. In this case? No, no, in another case. So we knew, but I knew that at some point the government would make their mitigation or would make their application for death eligibility, a decision from main justice, that we would be given an opportunity to file mitigating documents. We had sought an expert to help us with that. We had thought that that was the process we were going to go through. We never went through that process in this case. Mr. Felicetta is now for the first time acknowledging that it took them for about two years. We just waited. The government kept saying, we're waiting 60 days, 60 days, 60 days. Now for the- You've put together your mitigation package. We were prepared to, we were never given a deadline. We were never told that the government actually made an application. This is the first time we're being told today in this courtroom, I believe, that the government waited two years to even seek a decision. That is contrary to what the U.S. attorney at the time had been representing to the court and to us. Back in March of 2012, throughout 2012, throughout 2013, counsel of the U.S. attorney's office that was representing the government in this case had kept saying, we're waiting for a decision. As a matter of fact, I'll point the court to our docket entry 67, which is a decision on my bail application, my pretrial detention application, dated April 2 of 2013. So about a year after the initial arraignment. In a footnote denying my request to have my client released, Judge, Magistrate Judge Scott said, the government has commented in court since this case began that death is eligible for death penalty prosecution, subject to approval from the Department of Justice. For purposes of the pending bail motion, the government will ignore the government's, the court will ignore the government's comments and admonishes the government to resolve that issue one way or the other as quickly as possible. Now you find out that they hadn't even applied. They haven't even applied for another year. They're representing to Judge Scott and us that they're waiting 60 days. What do they mean by 60 days? 60 days implies you made the application. We're waiting to be asked for our mitigation package. We're just all standing around. We're waiting. By the time you could have prepared your package, Maine Justice had turned it down. They had turned it down. So a year later. So, so over a year later. So in June of June 9th of 2014. So this is about 23 months. I'm sorry. So a little over two years after the arraignment. Judge Scott, in another order, denying my client's release on pretrial detention. This time says, because we're arguing about the effect of having finally found the original photo array, he says, and we're reopening the motion argument. He says a reopening would add months of delay to this already two-year case on top of the catastrophic delay that could occur if the government does decide to seek the death penalty. After all, we're still waiting for a decision from the government. The government at that point had not yet decided. That's what we know. Now we're just finding out that they've now, they had made their application just around by then. What's the date of that? That is document number 134 dated June 9, 2014. So Mr. Falsetta is now saying, stating that it appears that they finally made the application a few months before this. About two years into the case. This is about two and a half years into the case, or a little over. About two and a half years. So now, and Judge Scott is still warning them saying, your decision on death could be catastrophic to what occurred in this case. We're all, the government in this case, and luckily it was not my esteemed colleague, Mr. Falsetta, who sits here. The government in this case treated the original indictment like a placeholder, like a felony complaint. They had our clients rounded up. They had them sit in jail. They opposed pretrial detention. And they sat on their thumbs for about two years, and we didn't get a death decision for about two years and ten months. May I ask, are you still on the CJA panel? I am. Is it still the practice in the Western District to have magistrate judges supervising criminal cases before trial? Yes, up until they issue their decisions, their report and recommendations, and then the district court judge takes over the case. It was an issue in Togano as well. Yes. And it was an issue in Togano as well. And Judge Coates, you asked the question of Mr. Thompson. Once a superseding indictment came out, what time do we attribute to the government? What we have to attribute to the government, because they waited two years and 11 months to finally remove the placeholder prior indictment and put a superseding indictment in with two new defendants and additional charges relating to the same Hobbs Act. Now, my client was not charged in the Singer murder, so my client should not have in any way had to sit there for two years and ten months and wait for the indictment to be superseded on unrelated charges for an unrelated kidnapping and robbery. But in any event, then for the next while, not only after the superseding indictment was put in place, but also right about the same time, the government suddenly miraculously found the original photo array at the detective's house. I think that was before the superseding. It was. But at that point, we were arguing as to whether we needed to reopen all the hearings because we had conducted the hearings without the original, without the witness's original notes on the photo arrays. So now we're asking whether to reopen it, and we did end up reopening it. Now, the litigation that occurred after the superseding indictment, because there were new Hobbs Act charges, as the court noted earlier, and because there were new defendants, and because there were new unrelated charges as to the co-defendants and not my client, we now had to sit through another year or two of motion practice and additional hearings that my client had to sit back. I'm sorry? For severance? Yes. Yes, we did. Did you raise in your severance argument a speedy trial argument? We did not because Judge Scott had already been warning the government. We'd raised it previously, and the judge was already telling the government, you got to make a decision on death. So when we were raising additional issues, we didn't think we had to use your talismanic language again. The government was well aware that we had raised speedy trial earlier, and Judge Scott was already saying, hey guys, get off your butt. And you were moving for bail regularly. We were moving for bail regularly. It was being denied regularly. So we were doing everything we could to, for me to, and my client, by the way, is still, after 78 months now, you'll hear about 72 months where he was in jail, and the government never did get him convicted on anything at the trial. He's now been on home confinement with GPS. He's basically incarcerated, but within his own home. Can't go to his backyard. Can't go to his front yard. So we've now got 78 months where all of our pre-trial detention motions were denied. Our post-jury mistrial was granted, but he's still on home confinement. I've got 78 months where I've got a client- Because the government plans to retry this case if we don't affirm scrutiny? They have vigorously fought against his post-trial release at all. And now he was released, but on home detention with GPS, which absolutely is better than being in jail, without a doubt. But it is still a form of incarceration. It's a huge loss of liberty. It's 78 months after the first placeholder indictment was put in place in this case, and I really would urge the court, I don't want to be presumptive, but I know in Togano where the court knew what its ruling was going to be early on before it gave a written decision to follow the same type of a procedure, if that's appropriate. Thank you, counsel. Thank you. We'll hear from the last counsel, representing Ernest Green. Good afternoon, your honors. May it please the court. I'm Jesse Pyle on behalf of defendant appellee, Ernest Green. With respect to the government's . . . actually, let me restart. With respect to Judge Cote's questions about the . . . It's Cote. Oh, excuse me. I'm so sorry. No problem. I apologize. This is a great way to start my first appeal. That's okay. With respect to Judge . . . You're not the first one. Oh, I'm sure. With respect to your questions about the attachment of the Sixth Amendment and the procedure, the lower court in Pinnock found that some of the delay in that case, which was so detrimental to the defense, was in part because of the government's decision to twice supersede the indictment, a finding which this court did not find was an error, did not reject in any way, and I would say is part of that court's decision. So in that sense, while the Sixth Amendment right might attach in a technical sense, as soon as there's a formal accusation, the government's tactical decision to supersede the indictment can, of course, prolong the period of time that a defendant spends, while legally innocent, in pretrial detention and can therefore, I think, add to a finding of prejudice under the speedy trial rubric. As to the government's claim that the timing of the defense's filing of this motion was opportunistic or that it was, in some way, an attempt to gain a tactical advantage over the government, first of all, speedy trial can't be waived. The defense could bring it at any time. That doesn't necessarily inoculate the defense from a charge of bringing the claim in bad faith, but I would argue that, as we pointed out in our motion, we came late to this case. I was admitted as an attorney in January of 2017, was hired as an associate in September. Mr. Harrington and I decided to write this motion, and this is after Mr. Harrington has come on after the death of Mr. Green's second attorney. We've just become familiar with the case. As soon as I finish writing the motion, we file it, and trial begins. Mr. Green was complaining about speedy trial from the very beginning, wasn't he? That's right, Your Honor. He was the one who was very vociferous. That's right, both at the arraignment and also in later occasions. And the government tries to argue that somehow, because he also, in some of those situations, asks for severance, that it doesn't count. Although, as I've cited in our brief, if you look at the transcript, he very curly associates the two things in his mind. He says, I want severance because this case is going on for so long. I want to move forward. The government opposed severance in each case whenever such a motion was made? Yes, I believe so, Your Honor. As to the standard of review, this is something I'll just offer briefly before I conclude. The government says that the standard of review for cases like this approaches de novo, and of course, this is a mixed question of fact and law. The factual findings by the district court are entitled to plain error or scrutiny. The legal determinations, the Barker balancing test is entitled to abusive discretion review, but the two cases that the government cites to say that the standard of review, therefore, approaches de novo, and that this circuit court is in no worse a position than the district court to do the balancing. In those cases, the panels both said that actually discretion in this sense is something of a term of art, and that in reality, some deference, in fact, a great deal of deference is due to a lower court's determination. The government tries to raise this challenge as an error in the balancing, but then spends the majority of their brief challenging the district court's factual determinations. In my mind, it's sort of a bootstrapping attempt to challenge the factual findings which are entitled to greater deference while saying, well, we're really attacking the legal determinations based on them. I think if the government looks more closely at the cases it cites, it'll see that in reality, a district court's determination is entitled to a greater degree of deference. Is it fair to say we've been a little inconsistent in exactly what deference is owed to the balancing? Better for you to say, Your Honor, than me. If there are no further questions . . . Thank you, counsel. Thank you. Mr. Felicetta, you reserve two minutes for rebuttal. Thank you, Your Honor. Is it true that the government waited two years before making the submission to Maine Justice? No, Your Honor.  I did not say to this court . . . When did you make the application? I don't know, Judge. Why isn't that in the record? Because it's the process of discussing the no-seq with the Department of Justice. But at some point, you file papers, written papers. Why aren't those papers in the record? It's a matter of confidentiality that the Department of Justice does not publicly issue . . . I understand that it's a private process, but at some point, you say, Dear Maine Justice, we want the death penalty in this case. We want an answer. That is in writing. When did that happen? Well, it starts as a conversation and finishes with a memo and a decision. But what I'm saying to the court, and what I'll reiterate, what I said before, was that when the conversation began in 2012, as stated on the record by the Assistant United States Attorney, but the Department of Justice would have necessarily had to have the cooperating witness, wasn't secured until February of 2014. When you said, we need another 60 days, that was not truthful because you needed forever until you got the new witness. No, what the assistant later said, and that's in the record, is he said, Judge, I obviously was not very good at my predictions of when the department would be able to make this decision, but it would necessarily, the department would necessarily have had to have that witness and the government would have been ready to go to superseding the indictment. So, why say 60 days? Why do you tell a court 60 days if it really turns on when you can find a witness? I just think the prosecutor was mistaken as to his understanding of the process. That it is 60 days generally from the time that you have all of the evidence. That's generally what the process is, 60 days. When he said it, you didn't have the witness. Well, the witness had testified at that point in grand jury, so the prosecutor mistakenly believed that he had it all. But it's not when they testify in grand jury, it's when they secure a guilty plea and say, okay, I'll cooperate with the government. And we didn't have that until 2014. So, what did the, what event did the 60 days measure? I believe the prosecutor was mistaken. He thought that the 60 days would be triggered from when the witness would have testified. But that's not what the 60 days is from. And then he repeated that error a couple of times? No, it was never repeated. Mr. Colbert said it was repeated 60 days, 60 days. That happened one time, and at a later date, the prosecutor says, I was mistaken, but we are not going to hold this case up for a death penalty decision. That may never come, because we may never have a superseding indictment. He acknowledged that. Defense counsel was queried by the magistrate judge, and they all says, we don't want to press ahead. And they did. They filed motion after motion. Everything was litigated. Judge, this was not Togano. This was not adamant, consistent, and explicit, frequent, or vociferous invocation of the right. This was infrequent, inconsistent, and doubtful. They each invoked the right. Yes, but just consider Defendant Green, who the court, who your Honor pointed out. Defendant Green early on said, I want a speedy trial, and I want to go pro se. And the magistrate court said, are you sure about that? Do you really want to go pro se? And subsequent to that, he then gets new counsel, and he comes in and files a whole robust new omnibus motion with lots of different parts that needed to be litigated. So while he says, on the one hand, I want a speedy trial, on the other hand, he's telling everybody, I want to litigate all this. His motion time is usually excluded, the time where he asks for some motion relief. Right. The technical exclusion. But just as a Sixth Amendment, I mean, he's representing to the court and the parties, I want to litigate this stuff because it benefits me. And that's exactly what he did. And with regards to severance, Judge, no severance motion was ever filed as to speedy trial. And at one point, in fact, Judge Scott, the magistrate judge, warned and cautioned the attorneys and said, listen, you just filed a whole slew of bail motions because you're saying the detention's going on too long. I direct you to file your severance motions with the district court judge if that's appropriate. They filed severance, but not for this reason. They filed it because of spillover. They filed it because they didn't want to be tried with their co-defendants. They never filed severance to say speedy trial. If they had, the government would have responded in a much different manner than we did. And what would the response have been? If it was based upon a legitimate and sincere desire to get to trial immediately, we would have granted that or we would have agreed to that severance and proceeded to trial. But we didn't because none of these defendants wanted to be tried alone and none of them wanted a speedy trial. You always have an overarching responsibility to provide a speedy trial. Do they have to say it for you to know that when they're incarcerated in pre-trial detention for more than two years, you have an obligation to do something? No, Judge, but the difference between what happened in Penick and Togano was those were institutional delays. And Mr. Thompson referred to that here today. That's what Judge Scrutiny charged us with, institutional delays. These are not institutional delays. But you told me you couldn't produce the defendants. The defendant was, the delay in producing the defendants was around the holiday season in 2012. It was a matter of 30 or 60 days. That's an institutional delay. We accept that in our brief, but they're charging us. The time where the photo array was in some officer's house, that was an institutional delay. But that didn't prevent, it was a neutral delay, but it didn't prevent them from being able to litigate or attack it. Nothing changed. And that's my point in all this. That's what I would submit to this court. If the assistant United States attorney hadn't been forthright, hadn't been open and If he hadn't done that, what would have changed in this case? But he's required to, as Judge Cote pointed out. He's in an abundance of caution. He's alerting the court and the parties that experienced counsel should be appointed. But assume he had said nothing. Assume he had said nothing and the court just proceeded with a Hobbs Act robbery. Nothing would have changed in terms of when this case went to trial. Why not? Because the defendants are the ones who instituted all the delay. They're the ones who filed the motions. They're the ones who took almost two years to file their objections. Well, they were waiting. Once you mentioned this, they were waiting for an answer. That's what counsel just told us. No, Judge. The objections took them. Their objections took them. And we started objecting to this in 2015. At docket, if you look at the special appendix filed by Mr. Rodriguez, 166 at foot no one. The government started objecting in 2015. And yet they keep asking for the delays for the objections to be filed. We're not asking for it. That's not like what happened in Penick where the court sat on the motion for 30 months. That's not like what happened in Togano where the institutional delays were the marshal service, the stenographers, the two magistrates that were used. None of these are applicable here. It took six months to get one of the stenographer's reports in this case, didn't it? It took six months. I didn't see that, Judge, no. Well, I saw that in the record. I'm not sure of that specific transcript. But I don't think that that held anything up or else I'm sure we would have addressed it. On the standard of review, can we at least agree it's whatever it is, it's not de novo? Yes. Not de novo. We conceded that in our reply brief. That's not what we intended to say. It's also not abuse of discretion. Right, Judge. The standard of review that we addressed in the reply brief, this was in regards to the Galeani case in 2013, that although it's a standard of abuse of discretion, the court said it's rarely viewed as a matter truly left to discretion. That's a term of art and it occurs when the district court bases its rulings on an erroneous view of the law, which is what I submit happened here, an erroneous view of Togano, you know, 16 days after it was published, and an erroneous assessment of the evidence. And you look at the second and third factors for Barker here. They're erroneously determined by the court. The second factor and the third factor. There were not sincere requests for a speedy trial or for severance. And as this court, you know, aptly noted in the— Each of the opposing counsel answered my question and said that their client defendants had a sincere desire for a speedy trial and made that known to the government. It wasn't sincere when you say speedy trial out of one side of your mouth and then immediately file multiple omnibus motions on the other side. What this court said in Togano, you stated, we do not mean to suggest that the word speedy trial ought to function as a magical incantation that guarantees an immediate trial to any defendant who so wishes. So while it may have been raised early, it was not raised often and it was not raised sincerely. And they want to now look back and say that there was some true desire for this as if it's a magical incantation that then gives them all that time chargeable to us. Are you suggesting that we should decide that the law is that every time a defendant goes into court, he or she has to say I want my speedy trial rights? Absolutely not, Judge. And we don't, at no point has the government ever suggested that. What I'm suggesting to the court is when a defendant says I want a speedy trial and then days or weeks later files multiple levels of omnibus motion that require litigation and they delay in getting their objections to those report and recommendations, that belies their request for a speedy trial. I'll follow that. Whatever time it takes to deal with their motions is excludable, isn't it? Right. It's excludable from the Speedy Trial Act, but that's different from a Sixth Amendment analysis. Well, it may be not identical, but it's hard to imagine a court finding a Sixth Amendment violation because of time taken up to decide because the defendants asked for some motion practice. Right. But I understand, but if Mr. Green is saying... Well, here, actually, that's sort of what happened here. There is no motion. There was no motion, I believe, in advance of the trial suggesting there was a violation of the Speedy Trial Act. That's correct. That's what it was. Because there was so much excludable time under the act. That's right. And there was nothing that triggered that. If one of the defendants had said speedy trial or severance for speedy trial, this would be a totally different discussion. Instead, they file four days before jury selection, get a hung jury, and then two weeks after Togano, look back and say it was the deceptor of the death penalty that caused these delays. That was, Your Honor, that was not a proper analysis of law or the facts in this case, and it's a miscarriage of justice. It's not right that this case was decided instead of a jury of 12 people unanimously. The jury didn't convict. Well, they weren't unanimous, but we're talking about somebody who was executed, and it ought to be decided that way. Any post-trial indication of the jury division? Judge, it's not a matter of record, but I did receive a call from two of the jurors, and it was nine to three to convict based on what they relayed to me. At least it was not one holdout. It was not one holdout, Judge, but . . . and I know that defense counsel had conversations that were quite different, so I don't think it's a matter for the court to consider that in its determination. What I would ask the court to ask yourselves is, was this the countless small choices of subtle neglect in Togano, or was this instead the defendants having very experienced counsel, vociferously attacking the government's evidence at every turn? We're required to then proceed as to each and every one of those adjournments to defend our case, and then at the end, for them to look back and say, we said speedy trial at one moment, magical incantation, all that time's chargeable to us. That's not what this court met in Togano, and I think that this court should reverse. Thank you, counsel. Thank you all. Very lively argument. We'll reserve decision.